# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

EVERGREEN SQUARE OF CUDAHY,
GRANT PARK SQUARE APARTMENTS
COMPANY and WASHINGTON SQUARE
APARTMENTS COMPANY,

Plaintiffs,

v.

Case No. 13-CV-743-JPS

WISCONSIN HOUSING AND ECONOMIC
DEVELOPMENT AUTHORITY,

Defendant and<br>Third Party Plaintiff,

v.

ORDER

SECRETARY OF THE UNITED STATES
DEPARTMENT OF HOUSING AND URBAN
DEVELOPMENT,

Third-Party Defendant.

---

The plaintiffs—three private, rental property owners in the Milwaukee metro area—have, at all times relevant, participated in a federal rental assistance program known as Section 8. (Docket #1); *see also* 42 U.S.C. § 1437f (2006). Section 8 is designed to ensure that low income families have access to decent and affordable housing. (Docket #72 ¶ 1). The plaintiffs claim that the defendant, the Wisconsin Housing and Economic Development Authority ("WHEDA"), failed to properly distribute Section 8 funds that were entitled to them under their Housing Assistance Payments ("HAP") contracts with WHEDA. (Docket #4). Because WHEDA receives all of its Section 8 money from the United States Department of Housing and Urban

Development ("HUD"),[1] WHEDA in turn filed a third-party breach of contract claim against HUD. (Docket #19).

After the plaintiffs filed their amended complaint on July 15, 2013 (Docket #4), WHEDA and HUD each filed motions to dismiss the pending claims against them (Docket #7, #29). The Court granted these motions on jurisdictional grounds. (*See* Docket #37). The Seventh Circuit took a different view, however, and concluded that this matter implicated the rare, and oft misunderstood, "federal ingredient" doctrine. *See Evergreen Square of Cudahy v. Wisconsin Hous. & Econ. Dev. Auth.*, 776 F.3d 463, 469 (7th Cir. 2015).

On remand, the Court addressed the parties' outstanding arguments with regard to their respective motions to dismiss. (Docket #37). The Court allowed the plaintiffs to proceed with the following claims against WHEDA:

1.    A breach of Washington Square Apartment Company's HAP contract for failing to automatically adjust Contract Rents on an annual basis;

2.    A breach of all of the plaintiffs' HAP contracts for employing a 0.01 reduction on non-turnover[2] units' rent adjustments; and

3.    A declaratory judgment claim to decide whether WHEDA may, with respect to Evergreen Square of Cudahy's HAP contract:

    a.    Require rent comparability studies as a prerequisite to receiving rent adjustments; and

    b.    Employ a 0.01 reduction on non-turnover units' rent adjustments.

---

[1] WHEDA receives this money pursuant to its Annual Contributions Contract ("ACC") with HUD. (See Docket #1 at 1).

[2] "Non-turnover" units are those units occupied by the same tenant on two consecutive HAP Contract anniversary dates. (Docket #72 ¶ 23).

(Docket #37). The Court granted the plaintiffs' voluntarily dismissal of Count III, a contract claim related to WHEDA's use of rent comparability studies.[3] (Docket #37).

With respect to WHEDA's third-party complaint, the Court permitted WHEDA to proceed on the following claims against HUD:

1.    A breach of contract claim on the grounds that, if WHEDA has breached its Section 8 HAP Contracts, HUD has breached the related ACCs with WHEDA; and

2.    A declaratory judgment claim to decide WHEDA's rights and obligations under the 1994 Amendments to Section 8 and HUD's implementation thereof.

(Docket #37).

All of the parties moved for summary judgment with respect to all of the pending claims made by, or against, them. (*See* Docket #66, #70, #74, #77). For the reasons explained below, the Court concludes that the undisputed facts demonstrate that WHEDA is entitled to judgment as a matter of law with respect to all of the plaintiffs' claims, and, as such, its motion will be granted. (Docket #70). In addition: (1) the plaintiffs' motion for summary judgment against WHEDA (Docket #77) will be denied; (2) WHEDA's motion for summary judgment against HUD (Docket #74) will be denied as moot; and, (3) HUD's summary judgment motion against WHEDA (Docket #66) will be denied as moot.

---

[3] The plaintiffs dismissed this claim because they admitted that they did not submit any rent comparability studies on which to base their claim. (Docket #37 at 21).

## 2. BACKGROUND

The facts of this case are largely undisputed.[4] The Court will provide a brief background on the purpose, evolution, and implementation of Section 8 before proceeding to explain the facts underlying the parties' pending summary judgment motions.

### 2.1 Section 8

Section 8 of the United States Housing Act of 1937 (42 U.S.C. § 1437f (1976))[5] was enacted in 1974 for the purpose of helping low-income families obtain decent and economically-mixed housing.[6] (Docket #72 ¶ 1). This statutory framework, which continues in effect today, seeks to achieve these goals by providing rent subsidies to property owners on behalf of low-income families living in housing owned primarily by non-public persons and entities. (Docket #72 ¶ 1).

Under the project-based Section 8 program, HUD channels rental assistance payments through a two-tiered system. At one level, HUD enters

---

[4]The plaintiffs and WHEDA have jointly stipulated to material facts. (Docket #72). Each party also submitted proposed findings of fact, independent of the joint stipulation. (*See* Docket #68, #73, #76, #77 Ex. 3, #79). To the extent any party disputes a proposed finding of fact, the Court will so note. (*See* Docket #79, #81, #82, #84, #85 Ex. 2, #86 Ex. 2, #91 Ex. 1).

[5] The contracts at issue in this case were made in the late 1970s and early 1980s. (Docket #72 ¶¶ 13-15). As such, the Court will attempt to address, as appropriate, the versions of the legislative materials referenced herein.

[6]HUD objects, in numerous instances, to the parties' "attempt[] to paraphrase" certain documents, statutes, and regulations, "which speak[] for [them]sel[ves]." (*See e.g.*, Docket #79 ¶¶ 1, 6, 8, 9). By and large, these objections are immaterial to the motions pending before the Court and will, therefore, not be addressed individually.

into an ACC with a public housing agency ("PHA"), such as WHEDA.[7] (Docket #72 ¶ 8). Under the ACC, HUD provides rental assistance payments (also known as annual contributions) to fund the housing agency's rental subsidy payments to an owner of rental housing. (Docket #72 ¶ 8). The PHA in turn enters into a HAP contract[8] with the owner, under which the owner receives monthly housing assistance payments from the PHA. (Docket #72 ¶ 8).

The housing assistance payments that owners receive from a PHA are ultimately used to reduce the rent paid by tenants who live in projects covered by a HAP contract. (Docket #72 ¶ 8). In order to accomplish this, the HAP contract sets the amount of the rent (known as the "Contract Rent") for each unit. (Docket #72 ¶ 10). Section 8 tenants pay a portion of the Contract Rent—based on their income and other factors—and the PHA pays the rest in the form of housing assistance payments to the owner. (Docket #72 ¶ 10).

Since its inception, Section 8 has contemplated certain rent adjustments for owners who operate Section 8 projects. *See* Housing and Community Development Act of 1974, Pub. L. No. 93-383, Title II, 88 Stat. 662 (codified at 42 U.S.C. § 1437f (1976)). The statute provides that rent subsidies distributed pursuant to an ACC must be adjusted as least annually "to reflect changes in the fair market rentals established in the housing area for similar types and sizes of dwelling units or, if the Secretary determines, on the basis of a reasonable formula." 42 U.S.C. § 1437f(c)(2)(A) (1976).

---

[7] For purposes of Section 8, PHA is defined by Section 3 of the United States Housing of 1937. (Docket #72 ¶ 8).

[8] A Section 8 HAP contract—which is entered into by the owner and a PHA—"sets forth the rights and duties of the parties with respect to the project and the payments under the Contract." (Docket #72 ¶ 9).

However, Congress also placed two market-based restraints on Contract Rents from the outset of the statutory program. The first restraint tied the *initial* HAP Contract Rents to HUD's market rent estimates, known as Fair Market Rents.[9] *See* 42 U.S.C. § 1437f(c)(1). Specifically, Section 8 caps each HAP Contract's initial Gross Rents—Contract Rents plus utility allowances—at 120 percent of the Fair Market Rents published by HUD. 42 U.S.C. § 1437f(c)(1). With the second restraint, Congress also linked *increases* in Contract Rents to market rate rents. Specifically, Section 8 contains a caveat, known as the "overall limitation" provision, which provides that rent adjustments "shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the Secretary." 42 U.S.C. § 1437f(c)(2)(C).

In order to implement statutory rent adjustments, HUD's Section 8 Programs rely on annual adjustment factors ("AAFs"). (Docket #72 ¶ 19). These AAFs permit HUD to calculate adjustments in Contract Rents for which an owner may be eligible under its HAP contract. (Docket #72 ¶ 19). HUD updates AAFs annually based upon a formula that involves Consumer Price Index data for rents and utilities. 24 C.F.R. § 883.207(b) (1976); 24 C.F.R. § 883.203 (1976); Publication of Schedule C—Contract Rent Automatic Annual Adjustment Factors, 41 Fed. Reg. 49440 (Nov. 8, 1976). HUD is required to publish the AAFs by notice in the Federal Register at least annually. (Docket #72 ¶ 19).

---

[9]HUD publishes the Fair Market Rents annually in the Federal Register to reflect the cost of rent and utilities, within each market area, for privately-owned rental housing that meets the objectives of the HUD Minimum Property Standards. *Id.*; *see also* 24 C.F.R. § 883.202 (1976); 24 C.F.R. § 883.101(b)(1) (1976).

Section 8 has undergone various amendments since inception, many of which relate to the way in which HUD authorizes rent adjustments. These revisions began during the 1980s, when HUD officials became increasingly concerned that "automatic adjustments were pushing rents at some Section 8 sites well above the market rates for comparable unsubsidized units." *One & Ken Valley Hous. Grp. v. Maine State Hous. Auth.*, 716 F.3d 218, 221 (1st Cir. 2013) *cert. denied*, 134 S. Ct. 986 (2014).

The first of these amendments was embodied in the Housing and Community Development Act of 1987 ("1988 Act"). Pub. L. No. 100-242, § 142(c)(2), 101 Stat. 1815, 1850 (1988) (codified at 42 U.S.C. § 1437f(c)(2)(C)). In the 1988 Act, Congress amended Section 8 to allow HUD or a PHA to deny an annual adjustment by submitting a "comparability study" to an owner sixty days prior to the anniversary date of a HAP contract. *Id.*; *cf. Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 21 (1993) (ruling, in the context of a constitutional challenge to the 1989 Amendments, that HUD had sufficient "discretion" under the HAP contracts in question to use comparability studies when enforcing the overall limitation provision).

Second, in the Department of Veterans Affairs and Housing and Urban Development and Independent Agencies Appropriations Act, 1995 ("1994 Act"), Congress again revised Section 8 to address its continuing concern about above-market Contract Rents. (Docket #72 ¶ 22). The 1994 Act made two significant changes. First, it provided that when a project's pre-adjusted rent exceeded the "fair market rental for an existing dwelling unit in the market area, the Secretary shall adjust the rent only to the extent that the owner demonstrates that the adjusted rent would not exceed the rent of an unassisted unit of similar quality, type, and age in the same market area." (Docket #72 ¶ 22) (citing Pub. L. No. 103-327, 108 Stat. 2315 (1994)). Second,

Case 2:13-cv-00743-JPS   Filed 01/04/16   Page 7 of 37   Document 92

the 1994 Act reduced by 0.01 the AAFs applicable to non-turnover units. (Docket #72 ¶ 23). However, in no case could the AAF be reduced to less than 1.0.[10] (Docket #72 ¶ 23).

On March 7, 1995, HUD issued Notice H 95-12 for the purpose of implementing the 1994 Act. (Docket #72 ¶ 25). Since Notice H 95-12, successive publications by HUD have carried forward the implementation of these policies, the most recent of which was Notice H 2002-10, issued on May 17, 2002. (Docket #72 ¶ 25). Pursuant to Notice H 2002-10, if a project's pre-adjustment Gross Rents exceed the applicable Fair Market Rents published by HUD, a rental property owner is required to follow a certain procedure in order to receive its Section 8 rental adjustments. (Docket #72 ¶ 26). Under Notice H 2002-10, the owner is required to submit an "Estimate of Market Rent by Comparison" on form HUD-92273 at least sixty days before the anniversary date of the applicable HAP contract.[11] (Docket #72 ¶ 26). In addition, under Notice H 2002-10, whenever a project is eligible for an adjustment of its Contract Rents, the AAF used to adjust the project's Contract Rent must be reduced by 0.01 for non-turnover units. (Docket #72 ¶ 28).

---

[10]Beginning in 1995, HUD has published two tables of AAFs in the Federal Register, which are denoted as Table 1 and Table 2. (Docket #72 ¶ 29). The Table 2 AAFs reduce the Table 1 AAFs by 0.01, except that no AAF is reduced below 1.000. (Docket #72 ¶ 29). The Table 2 AAFs are applicable to non-turnover units, and the Table 1 AAFs are applicable to turnover units. (Docket #72 ¶ 30).

[11]The rent adjustment to which an owner may be entitled to receive under the HAP contract is limited to the lesser of the project's Contract Rents, as adjusted by the AAF, and adjusted comparable rent. (Docket #72 ¶ 27). The adjusted comparable rent is the market rent calculated on Form 92273 plus the project's initial difference. (Docket #72 ¶ 27). The initial difference is the difference between a Section 8 project's initial Contract Rent and the rent for a comparable unassisted project on the effective date of the projects's original HAP contract.

## 2.2    The Parties

Plaintiff Evergreen Square of Cudahy ("Evergreen") is a Wisconsin general partnership. (Docket #72 ¶ 1). Evergreen is the owner of Evergreen Square, a 105-unit multifamily housing rental project located in Cudahy, Wisconsin. (Docket #72 ¶ 2). Plaintiff Grant Park Square Apartments Company ("Grant Park") is also a Wisconsin general partnership. (Docket #72 ¶ 3). Grant Park owns Grant Park Square Apartments, a 153-unit multifamily housing rental project located in South Milwaukee, Wisconsin. (Docket #72 ¶ 3). Plaintiff Washington Square Apartments Company ("Washington Square), is a Wisconsin Limited Liability Partnership that owns Washington Square Apartments, an 88-unit multifamily housing rental project in Cudahy, Wisconsin. (Docket #72 ¶ 4).

The defendant (and third-party plaintiff), WHEDA, is a public body corporate and politic of the State of Wisconsin, Wis. Stat. §234.02(1), and a PHA as defined by 42 U.S.C. § 1437a(B)(6)(A). (Docket #72 ¶ 6).

The third-party defendant, HUD, is the executive agency of the United States charged with administering the Section 8 housing program. (Docket #72 ¶ 7). Julian Castro is the current Secretary of HUD. (Docket #72 ¶ 7).

## 2.3    The HAP Contracts

Each plaintiff is the owner of a rental project that is assisted under Section 8. (Docket #72 ¶ 5). Accordingly, they are each a party to a HAP contract with WHEDA.[12] (Docket #72 ¶ 12). WHEDA is, in turn, a party to a related ACC with HUD for each of the plaintiffs' projects. (Docket #72 ¶ 12). Specifically,

---

[12]HUD signed and approved each of the HAP contracts between WHEDA and the plaintiffs. (Docket #72 ¶ 12).

- The Evergreen HAP contract became effective on April 1, 1977, has been renewed seven times since 1977, and is set to expire on March 31, 2017 (Docket #72 ¶ 13);

- The Grant Park HAP contract became effective on July 1, 1980, was renewed five times since 1980, and expired on June 30, 2010 (Docket #72 ¶ 14); and

- The Washington Square HAP contract became effective on December 1, 1982, was renewed two times since 1982, and expired on November 30, 2012.[13] (Docket #72 ¶ 15).

Evergreen's and Grant Park's HAP contracts, while similar in overall form to the Washington Square HAP contract, have a significantly different "annual adjustment" provision. On the one hand, both the Evergreen and Grant Park HAP contracts state that, "[o]n each anniversary date of the [HAP] [c]ontract, the Contract Rents shall be adjusted by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government."[14] (Docket #72 ¶ 20). On the other hand, Washington Square's HAP contract provides that, "[u]pon request from the owner to [WHEDA], Contract Rents will be adjusted on the anniversary date of the

---

[13]Thus, the anniversary date for Evergreen's HAP contract is April 1; the anniversary date for the Grant Park HAP contract was July 1; and the anniversary date for the Washington Square HAP contract was December 1. (Docket #72 ¶ 16).

[14]These provisions are embodied in Section 1.9(b)(2). (*See* Docket #76, Ex.1 at 16-17 (Evergreen HAP); Docket #76, Ex. 2 at 8 (Grant Square HAP)).

[HAP] [c]ontract in accordance with 24 CFR Part 888 and this [c]ontract. See, however, paragraph (d)."[15] (Docket #72 ¶ 21).

Despite these differences, all of the plaintiffs' HAP contracts contain roughly the same overall limitation provision. (Docket #72 ¶ 32). The overall limitation provision of the Evergreen and Grant Park HAP contracts is contained in Section 1.9(d) and states that,

> [n]otwithstanding any other provisions of this [c]ontract, adjustments as projected in this section shall not result in material differences between the rents charged for assisted and comparable non-assisted units, as determined by [WHEDA]…; provided, that this limitation shall not be construed to prohibit differences in rents between assisted and comparable unassisted units to the extent that such differences may have existed with respect to the initial Contract Rents.

(Docket #72 ¶ 32). The overall limitation provision in Washington Square's HAP contract states that, "[n]otwithstanding any other provisions in this [c]ontract, adjustments…shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by [WHEDA]…; except to the extent that differences existed with respect to the contract rents set at Contract Execution." (Docket #72 ¶ 32).

WHEDA alleges that it has administered the HAP contracts at issue in this case in accordance with HUD's Notice H 95-12, as carried forward by Notice H 2002-10, and has adjusted Contract Rents only as directed or

---

[15]Washington Square's annual adjustment provision is embodied in Section 2.7(b)(1) of Washington Square's HAP contract. (*See* Docket #76, Ex. 3 at 17). The reference to "paragraph (d)" in Section 2.7(b)(1) refers to the overall limitation provision.

permitted by HUD.[16] (Docket #80 at 4; Docket #76, Ex. 7 at 3). In processing the plaintiffs' rent adjustments during all times relevant, WHEDA has used Table 1 AAFs when adjusting Contract Rents for turnover units and Table 2 AAFs when adjusting Contract Rents for non-turnover units. (Docket #72 ¶ 31). Moreover, from 2006 until the Washington Square HAP contract expired in 2012, WHEDA only approved adjustments to Washington Square's Contract Rents when Washington Square submitted a rent adjustment request to WHEDA. (Docket #72 ¶ 42).

More specifically, during the relevant time period, the undisputed fact show that leading up to the December 1 anniversary dates of the Washington Square HAP contract, Gross Rents exceeded the applicable Fair Market Rents for:

- One-bedroom units from 2007-2011 (Docket #79, Ex. 2 ¶ 30);
- Two-bedroom family units in 2007 (Docket #79, Ex. 2 ¶ 32);
- Two-bedroom handicapped units in 2007 (Docket #79, Ex. 2 ¶ 34);
- Two-bedroom elderly units in 2007 (Docket #79, Ex. 2 ¶ 36); and
- Three-bedroom units from 2007-2010 (Docket #79, Ex. 2 ¶ 38).

However, Gross Rents did *not* exceed the applicable Fair Market Rents for Washington Square's:

- Two-bedroom family units in 2008-2010;
- Two-bedroom handicapped units in 2008-2010; and
- Two-bedroom elderly units in 2008-2010

---

[16]The plaintiffs admitted that they "did not submit any rent comparability studies…." (Docket #58 at 20-21) (citing Docket #24 at 6). The Court has no information as to how rent comparability studies are treated by WHEDA.

(Docket #79 ¶¶ 19, 21, 23; #67 at 14 n.6).

Ultimately, Washington Square only received rent adjustments on:

• Two-bedroom family units in 2009-2011;

• Two-bedroom handicapped units in 2009-2010;

• Three-bedroom family units in 2011.

(Docket #73, Ex. 8 at 4).

All of this information is embodied in Table A below.

| | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|---|
| 1-BR Elderly Units | Unknown | No request | No request | No request | Request Withdrawn | No request |
| | Unknown | No receipt | No receipt | No receipt | No receipt | No receipt |
| | GR>FMV | GR>FMV | GR>FMV | GR>FMV | GR>FMV | GR>FMV |
| 2-BR Family Units | No request | No request | No request | Request | Request | Request |
| | No receipt | No receipt | No receipt | Receipt | Receipt | Receipt |
| | GR>FMV | GR>FMV | GR<FMV | GR<FMV | GR<FMV | GR>FMV |
| 2-BR Handicap Units | No request | No request | No request | Request | Request | No request |
| | No receipt | No receipt | No receipt | Receipt | Receipt | No receipt |
| | GR>FMV | GR>FMV | GR<FMV | GR<FMV | GR<FMV | GR>FMV |
| 2-BR Elderly Unit (one) | No request | No request | No request | No request | Request | No request |
| | No receipt | No receipt | No receipt | No receipt | Receipt | No receipt |
| | GR>FMV | GR>FMV | GR<FMV | GR<FMV | GR<FMV | GR>FMV |
| 3-BR Family Unit | No request | No request | No request | No request | Request Withdrawn | Request |
| | No receipt | No receipt | No receipt | No receipt | No receipt | Receipt |
| | GR>FMV | GR>FMV | GR>FMV | GR>FMV | GR>FMV | GR>FMV |

Table A: Table Representing Washington Square Rent Adjustment Request and Receipts[17]

---

[17]This data was taken from the parties' collective filings. (*See* Docket 68 ¶¶ 16-40; Docket #73, Ex. 8 at 4; Docket #79 ¶¶ 7-17). In addition, "BR" is used to designate "bedroom;" "GR" is used to designate "Gross Rents;" and "FMV" is used to designate "Fair Market Rents."

WHEDA alleges that all the funds that it used to pay the plaintiffs' housing assistance payments were provided by HUD pursuant to the ACCs that it entered into with HUD.[18] (Docket #76 ¶ 2). WHEDA and HUD dispute whether WHEDA's breach of contract claim against HUD is, in essence, one of indemnification, for which there is no standard provision in the ACC. (See Docket #84 ¶¶ 41-42).

3.    LEGAL STANDARD

When a party files a motion for summary judgment, it is their "contention that the material facts are undisputed and the movant is entitled to judgment as a matter of law." *Hotel 71 Mezz Lender LLC v. Nat. Ret. Fund*, 778 F.3d 593, 601 (7th Cir. 2015) (citing Fed. R. Civ. P. 56(a)). "Material facts" are those facts which "might affect the outcome of the suit," and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, to have a genuine dispute about a material fact, a party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586 (1986); namely, the party in opposition "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

"Where…the movant is seeking summary judgment on a claim as to which it bears the burden of proof, it must lay out the elements of the claim, cite the facts it believes satisfies these elements, and demonstrate why the

---

[18]HUD does not deny this fact, but merely objected to this proposed finding of fact because it was "not limited to the time period relevant to this case." (Docket #81 ¶ 2).

record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claims." *Hotel 71 Mezz*, 778 F.3d at 601. In analyzing whether summary judgment should be granted, a court must draw all reasonable inferences from the materials before it in favor of the non-moving party. *Id.* When a court denies a motion for summary judgment, it "reflects the court's judgment that one or more material facts are disputed or that the facts relied on by the motion do not entitle the movant to judgment as a matter of law." *Id.* at 602.

4.      ANALYSIS

The plaintiffs maintain two breach of contract claims and one declaratory judgment claim against WHEDA. (*See* Docket #58). With respect to the plaintiffs' breach of contract claims, the plaintiffs allege that: (1) WHEDA breached Washington Square's HAP contract by failing to automatically adjust its Contract Rents; and (2) WHEDA breached all of the plaintiffs' HAP contracts applying Table 2 AAFs for non-turnover units when calculating rent adjustments. (*See generally* Docket #71). Lastly, the plaintiffs request a declaration from this Court that: (1) WHEDA may not require Evergreen to submit a rent comparability study as a prerequisite to receiving annual rent increases; and (2) the AAFs used to calculate Evergreen's future rent adjustments may not be reduced by .01 for non-turnover units. (Docket #4 at 12).

In addition, WHEDA alleges that if the Court finds WHEDA liable for breaching the plaintiffs' HAP contracts, then HUD must, therefore, be liable for breaching WHEDA's corresponding ACCs with HUD. (*See generally* Docket #75). WHEDA also seeks a declaration of its rights and responsibilities in applying the 1994 Act and Notice H 95-12, and its right to have such rent adjustments funded by HUD pursuant to its ACCs. (Docket

#19 at 8). HUD and WHEDA agree that, if the Court finds that WHEDA is entitled to judgment as a matter of law on all of the plaintiffs' claims, then WHEDA's claim against HUD is moot. (Docket #75 at 4; Docket #78 at 20).

Each of these claims will be discussed in turn.

4.1     The Plaintiffs' Contract Claims

"In evaluating a breach of contract claim, a court must determine whether a valid contract exists, whether a party has violated its terms, and whether any such violation is material such that it has resulted in damages." *Steele v. Pacesetter Motor Cars, Inc.*, 2003 WI App 242, ¶ 10, 267 Wis. 2d 873, 880, 672 N.W.2d 141, 144. "[I]nterpretation of an unambiguous contract is a question of law." *First Bank & Trust v. Firstar Info. Servs., Corp.*, 276 F.3d 317, 322 (7th Cir. 2001); *see also Arlington Plastics Machinery*, 2003 WI 15, ¶ 15, 259 Wis.2d 587, 600, 657 N.W.2d 411, 418 (same). A well-settled principle of Wisconsin[19] contract law is that courts "must construe contracts as they are written," *Elkhart Lake's Rd. Am., Inc. v. Chicago Historic Races, Ltd.*, 158 F.3d 970, 972 (7th Cir. 1998), and, when interpreting an agreement, a court's "objective is to ascertain the true intentions of the parties," *Wadzinski v. Auto–Owners Ins. Co.*, 342 Wis.2d 311, 818 N.W.2d 819, 824 (2012). In so doing, "contract terms should be given their plain or ordinary meaning." *Huml v. Vlazny*, 2006 WI 87, ¶ 52, 293 Wis.2d 169, 196, 716 N.W.2d 807, 820. When the contract is unambiguous, "determin[ing] the parties' intent ends

---

[19]The parties do not dispute the application of Wisconsin law to the parties' state-law breach of contract claim. Indeed, the application of state law to such a case was expressly contemplated by the Supreme Court's foundational ruling. *Grable & Sons Metal Products, Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 320 (2005) (Thomas, J., concurring) ("The Court faithfully applies our precedents interpreting 28 U.S.C. § 1331 to authorize federal-court jurisdiction over some cases in which state law creates the cause of action but requires determination of an issue of federal law....").

with the four corners of the contract, without consideration of extrinsic evidence." *Id.* (citing *Goldstein v. Lindner*, 2002 WI App 122, ¶ 12, 254 Wis.2d 673, 648 N.W.2d 892).

### 4.1.1 Washington Square Was Not Entitled to Automatic Rent Adjustments Under Its HAP Contract

The parties do not dispute that they are bound by contract; rather, the plaintiffs' first claim solely disputes the nature of WHEDA's obligations under Washington Square's HAP contract. (Docket #71 at 8-11). The plaintiffs argue that WHEDA was obligated to provide automatic adjustments to Washington Square's Contract Rents on each anniversary of Washington Square's HAP contract. (Docket #71 at 8). In response, WHEDA raises two arguments. First, WHEDA[20] argues that the plaintiffs' claim disregards the plain language of Washington Square's HAP contract, which requires Washington Square to "request" a rent adjustment before it receives one. (Docket #80 at 2-6). In other words, WHEDA argues that the HAP contract's "annual adjustments" provision is not automatic; instead, WHEDA argues that the provision is subject to a condition precedent which was not satisfied on each year in which Washington Square did not receive a rent adjustment. (Docket #80 at 2-6). As such, according to WHEDA, its duty to perform and provide annual adjustments to Washington Square never arose. (Docket #80 at 2-6). Second, WHEDA argues that even had Washington Square requested annual adjustments, it would not have been entitled to them under the

---

[20]In HUD's brief in opposition to WHEDA's motion for summary judgment, HUD also argued in opposition to the plaintiffs' motion for summary judgment. (*See* Docket #78). HUD and WHEDA make very similar arguments. (*Compare* Docket #78 *with* Docket #80). As such, the Court will primarily confine its discussion herein to the arguments raised by WHEDA, and will note when HUD addresses any additional arguments that were not also raised by WHEDA.

overall limitation provision embodied in Section 2.7(d) of Washington Square's HAP contract. (Docket #80 at 4-6). For the reasons detailed herein, the Court agrees with WHEDA.

### 4.1.1.1 Washington Square Did Not Satisfy the HAP Contract's Condition Precedent

The Court must begin its analysis with the language of Washington Square's HAP contract. *See 1325 N. Van Buren, LLC v. T-3 Grp., Ltd.*, 2006 WI 94, ¶ 53, 293 Wis. 2d 410, 441, 716 N.W.2d 822, 837. Here, Section 2.7(b) provides that, "[u]pon request from [Washington Square] to [WHEDA], Contract Rents will be adjusted on the anniversary date of the [HAP] [c]ontract in accordance with 24 C.F.R. Part 888 and this [c]ontract. See, however, paragraph (d)." (Docket #72 ¶ 21). The face of this HAP contract makes clear that Washington Square's ability to receive adjustments turns on two factors: (1) Washington Square's choice to "request" an adjustment; and (2) the limitation embodied in paragraph 2.7(d). (*See* Docket #72 ¶ 21). In other words, Washington Square was obligated to "request" a rent adjustment in order to receive one.

A contractual duty that arises solely upon the happening of some stated event, such as the submission of a rent adjustment request, is commonly referred to as a "conditions precedent." *BMD Contractors, Inc. v. Fid. & Deposit Co. of Maryland*, 679 F.3d 643, 650 (7th Cir. 2012) ("'Condition precedent' is a legal term of art with a clear meaning: '[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises.'") (citing Black's Law Dictionary 334 (9th ed. 2009)); *see also Price v. Ross*, 45 Wis. 2d 301, 306, 172 N.W.2d 633, 635 (1969) (explaining that a condition precedent "must be performed or happen before a duty of immediate performance arises on the promise which the condition

qualifies"). "The satisfaction of a condition precedent 'is generally subject to the rule of strict compliance.'" *Greenleaf L.P. v. Illinois Hous. Dev. Auth.*, No. 08-C-2480, 2010 WL 3894126, at *5 (N.D. Ill. Sept. 30, 2010) (citing E. Farnsworth, Farnsworth on Contracts § 8.3, at 353 (1990)); *see also* Richard A. Lord, 13 Williston on Contracts § 38:6 (4th ed. 2000) ("As a general rule, unless the performance is waived, excused, or prevented by the other party, or unless he or she repudiates the contract, conditions which are either express or implied in fact must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions.").

The plain language of Washington Square's HAP contract indicates that WHEDA's duty to conduct a rental adjustment was conditioned upon Washington Square's request for an adjustment. Unlike the contractual language at issue in *Smurfit Newsprint Corp v. Southeast Paper Mfg. Co.*, the language of Section 2.7(b) did not make the request for an annual adjustment subject to any other term and/or condition of the contract. 368 F.3d 944, 952 (7th Cir. 2004); *Greenleaf L.P.*, 2010 WL 3894126, at *5 (concluding the same with respect to *Smurfit*'s applicability to the language of Section 2.7(b)). Instead, the condition was straight forward and precise: if Washington Square asked for an adjustment of its Contract Rents, then WHEDA would do so "in accordance with 24 C.F.R. Part 888." (Docket #73, Ex. 3 at 17). The provision's reference to 24 C.F.R. Part 888 does not in any way limit or obfuscate the mandatory nature of the condition; it merely states the manner in which WHEDA would fulfill its obligation, once triggered, under the HAP contract.

The plaintiffs admit that WHEDA did not deny any of its requests for a rent adjustments. (Docket #73, Ex. 8 at 8). Moreover, the only years in which WHEDA failed to adjust Washington Square's Contract Rents were

the years in which Washington Square did not submit an adjustment request. (Docket #72 ¶ 42). Under the rule of strict compliance, therefore, on the years that Washington Square failed to comply with the contractual condition precedent, WHEDA's duty to perform never arose. *See Greenleaf L.P.*, 2010 WL 3894126, at *5. It goes without saying, therefore, that without a duty to perform during the relevant time period, Washington Square did not breach Washington Square's HAP contract.

Other courts, including the Federal Circuit, have examined the same HAP contract language contained in Section 2.7(b) and reached the same conclusion. *See e.g.*, *Haddon Hous. Associates, Ltd. P'ship v. United States*, 711 F.3d 1330, 1336 (Fed. Cir. 2013). In fact, every court to decide whether a "request" for an annual rent adjustment was a condition precedent under the language of Section 2.7(b) has answered that question in the affirmative. *See id.*; *Haddon Hous. Assocs., LLC v. United States*, 99 Fed. Cl. 311, 326 (2011); *Cathedral Square Partners Ltd. P'ship v. S. Dakota Hous. Dev. Auth.*, No. CIV 07-4001, 2011 WL 43019, at *8 (D.S.D. Jan. 5, 2011) *on reconsideration*, 875 F. Supp. 2d 952 (D.S.D. 2012); *Greenleaf L.P.*, 2010 WL 3894126, at *5. The plaintiffs' reliance on contrary authority is simply unpersuasive, as those cases interpreted materially different contractual language. *See e.g.*, *Park Props. Assoc., L.P. v. United States*, 74 Fed. Cl. 264 (2006); *Statesman II Apartments, Inc. v. United States*, 66 Fed. Cl. 608 (2005); *Cuyahoga Metro. Hous. Auth. v. United States*, 57 Fed. Cl. 751, 761 (2003).

Moreover, the plaintiffs' argument that the language of the HAP contract, when read in conjunction with 24 C.F.R. § 888, reflects the parties' intention that rent adjustments should be automatic contravenes basic rules of contract interpretation. First, the argument ignores the fact that, in the course of interpreting an *unambiguous contract*, the Court need not consult

any further than the four-corners of the memorialized agreement. *See Town Bank v. City Real Estate Dev.*, LLC, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 356, 793 N.W.2d 476, 484. Second, the plaintiffs' argument obfuscates the natural reading of the HAP contract, which suggests that the "contract…require[s] [a] party to request a rent adjustment that will then [be calculated] according to automatic adjustment factors." *Haddon Hous. Assos.*, 99 Fed. Cl. at 326; *see also Cathedral Square Partners Ltd. P'ship*, 2011 WL 43019, at *8 (concluding the same). Third, this Court must "attempt to give meaning to every provision of the contract," and the Court cannot simply read out clear and unambiguous language that required Washington Square to request a rent adjustment in order to receive one. *Land of Lincoln Goodwill Indus., Inc. v. PNC Fin. Servs. Grp., Inc.*, 762 F.3d 673, 679 (7th Cir. 2014); *Star Direct, Inc. v. Dal Pra*, 2009 WI 76, ¶ 62, 319 Wis. 2d 274, 304, 767 N.W.2d 898, 913; *see also I.A.E., Inc. v. Shaver*, 74 F.3d 768, 778 (7th Cir. 1996) (finding that although condition precedents are generally disfavored, they are only disfavored to the extent that they "will not be read into a contract unless required by plain, unambiguous language").

In sum, the plain language of Washington Square's HAP contract required Washington Square to request a rent adjustment before WHEDA's duty to perform arose. Because Section 2.7(b) contained an unambiguous condition precedent, which Washington Square admittedly did not satisfy, WHEDA had no opportunity to—and indeed did not—breach Washington Square's HAP contract.

#### 4.1.1.2 Washington Square Was Not Excused or Prevented from Performing

Alternatively, the plaintiffs assert that, even if the language in Section 2.7(b) of Washington Square's HAP contract created a condition precedent,

Washington Square was excused from performing that condition. (*See generally* Docket #85, #86); *see also Smurfit Newsprint Corp*, 368 F.3d at 951 ("As a general rule, unless the performance [of a condition precedent] is waived, excused, or prevented by the other party, or unless he or she repudiates the contract, conditions which are either express or implied in fact must be literally met or exactly fulfilled or no liability can arise on the promise qualified by such conditions.") (internal citations omitted). The plaintiffs argue that Washington Square was excused from fulfilling the condition precedent because: (1) WHEDA repudiated Washington Square's HAP contract by requiring Washington Square to complete rent comparability studies when submitting rent adjustment requests; (2) WHEDA prevented Washington Square from complying with the condition precedent under Section 2.7(b); and (3) the Court's enforcement of the condition precedent in Section 2.7(b) would result in disproportionate forfeiture. (Docket #85 at 6-7).

WHEDA and HUD disagree. (Docket #88 at 3-6; Docket #87 at 3-6). With regard to rent comparability studies, WHEDA and HUD assert[21] that these studies are permissible and reasonable tools that WHEDA relies on in order to enforce the overall limitation clause contained in Washington

---

[21]To be clear, WHEDA (and HUD) largely confine their discussion about the propriety of rent comparability studies within the context of their arguments about the applicability and implementation of the overall limitation clause. (*See e.g.*, Docket #87 at 3-11; Docket #88 at 3-8). In other words, neither WHEDA nor HUD explicitly position their arguments about comparability studies in response to the plaintiffs' claim that Washington Square was excused from performing because WHEDA breached. These arguments, however, are two sides of the same coin and are ultimately irrelevant to the disposition of this case.

Square's HAP contract.[22] (*See* Docket #71 at 9-11; Docket #87 at 9-11). HUD also points out that, under the election of remedies doctrine, even had WHEDA breached the HAP contract, the plaintiffs only treated that breach as a partial breach, and, as such, the plaintiffs were not excused from performing the condition precedent embodied in Section 2.7(b). (Docket #87 at 3-5). Lastly, WHEDA and HUD argue that the record and case law simply fail to support the plaintiffs' prevention and forfeiture arguments. (Docket #88 at 3-6). For the sake of overall clarity, the Court will address these arguments in reverse order.

First, the Court concludes that the forfeiture doctrine is not applicable to this case. That doctrine provides that "[t]o the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." Restatement (Second) of Contracts § 229; *see also id.* cmt. b ("The rule stated in the present Section is, of necessity, a flexible one, and its application is within the sound discretion of the court.").

The fact that WHEDA only adjusted Washington Square's rents when Washington Square asked for an adjustment strongly suggests that the condition precedent in Section 2.7(b) was a material term of the HAP contract. According to HUD's Notice H 2002-10, rent requests set into motion a time and labor intensive process, none of which would occur absent a

_____

[22]Section 2.7(d), Washington Square's overall limitation clause states, "[n]otwithstanding any other provisions in this [c]ontract, adjustments…shall not result in material differences between the rents charged for assisted and comparable unassisted units, as determined by the HFA…; except to the extent that differences existed with respect to the contract rents set at Contract Execution." (Docket #73, Ex. 3 at 17).

request from the owner, and, as such, this language does not appear to have created a "de minimus" or mere "technical term," which courts look for in assessing materiality. *Cf. Sahadi v. Cont'l Illinois Nat. Bank & Trust Co. of Chicago*, 706 F.2d 193, 197 (7th Cir. 1983) (finding a genuine issue of fact as to whether a one-day late interest payment on a multi-million dollar loan was material). Though Washington Square claims that its ability to generate revenue "constituted the essence of the agreement" (Docket #86 at 8), the Court cannot alter the parties' agreement over a material term in plain contravention of the contractual language upon which the parties agreed. (*See supra* Part 4.1.1.1); *see also Indian Harbor Ins. Co. v. City of San Diego*, 972 F. Supp. 2d 634, 654 (S.D.N.Y. 2013) *aff'd*, 586 F. App'x 726 (2d Cir. 2014) (finding that there was "no reason to excuse the City's failure to comply with the timely notice requirement [because it was] not reasonable for an insured to rely on an insurance carrier's performance after sitting on a claim for weeks or months without reporting it, in the face of a clause calling for notice of claims as soon as practicable and decades of precedent interpreting such clauses strictly.").

Second, the Court disagrees that WHEDA in any manner prevented Washington Square from complying with the condition precedent found in Section 2.7(b). "In contract law, the general principle known as the doctrine of prevention provides that, 'if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused.'" *Tabatabai v. W. Coast Life Ins. Co.*, 664 F.3d 663, 666 (7th Cir. 2011) (citing 13 Richard A. Lord, Williston on Contracts § 39:3 (4th ed. 2000)). The plaintiffs' prevention argument consists merely of a citation to *Allen & O'Hara, Inc. v. Barrett Wrecking, Inc.*, 964 F.2d 694, 696 (7th Cir. 1992), in which the Seventh Circuit held that a non-breaching party's failure

to demand prejudgment interest was excused in light of the contract's breach, termination, and subsequent litigation, all of which rendered that demand futile. (Docket #86 at 7-8). *Allen & O'Hara, Inc.* is inapposite to a situation in which the plaintiffs have presented no evidence to suggest that WHEDA in any way prevented Washington Square from requesting a rent adjustment. Washington Square submitted no less than seven rent requests during the applicable limitations period, and, whenever it asked for an adjustment, it received one. (Docket #73 ¶ 3; Docket #79 ¶ 17). Thus, the supposition that WHEDA rendered Washington's Square's requests for rent adjustments impossible is contrary to the undisputed facts. *See Haddon Hous. Associates, Ltd. P'ship*, 711 F.3d at 1336 ("Absent a showing that HUD took some action that prevented or hindered Haddon's ability to submit its requests, the prevention doctrine does not apply to excuse Haddon's failure to submit rent requests.…").

Third, it is unnecessary to decide the plaintiffs' argument that WHEDA repudiated Washington Square's HAP contract by "requiring Washington [Square] to submit a rent comparability study as a prerequisite to receiving the rent increase to which Washington [Square] was otherwise entitled" because this claim: (1) is unsupported by the record; and (2) in any event, fails to support plaintiffs' theory of "excuse" under the election of remedies doctrine. (Docket #85 at 6).

The plaintiffs concede that WHEDA's alleged "require[ment]" for rent comparability studies only applied "[w]hen the Gross Rents at Washington Square were greater than the applicable Fair Market Rents published by HUD annually in the Federal Register." (Docket #85 at 6). However, the plaintiffs also "determined that they did not submit any rent comparability studies" to WHEDA within the limitations period. (Docket #24 at 6 n. 3). This

fact is especially poignant in light of the Court's observation that in 2011 Washington Square received rent adjustments on both its two-bedroom and three-bedroom family units *without* having to submit rent comparability studies.[23] (*See supra*, Table A). Thus, the plaintiffs' argument appears to be that *if* Washington Square would have submitted a rent adjustment request during the years in which they did not receive one, they *may* have been denied an adjustment, absent a rent comparability study, *if* their Gross Rents exceeded Fair Market Rents. The fact that the Court is left in doubt as to: (1) whether WHEDA was in fact enforcing the rent comparability policy; (2) how WHEDA was enforcing its rent comparability policy; and (3) whether Washington Square would have been denied adjustments for the years in which it did not receive them, leaves too many gaps for the Court to fill. *Cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim.... Judges are not like pigs, hunting for truffles buried in briefs."). Moreover, this argument sets forth essentially the same breach of contract claim that the plaintiffs' filed, and then voluntarily dismissed, against WHEDA. (Docket #24 at 6 n. 3).

Instead of delving into this factually deficient and tenuous theory, the Court finds that even had WHEDA potentially breached by requiring rent comparability studies in certain circumstances, Washington Square was not excused from performing the condition precedent in Section 2.7(b) under the doctrine of remedies. As explained by the Federal Court of Claims,

---

[23] In both of these years, the units' Gross Rents exceeded Fair Market Rents, and, as such, under HUD Notice H 2002-10, one might have expected a rent comparability study to have been submitted and/or required. (*See supra*, Table A).

Case 2:13-cv-00743-JPS   Filed 01/04/16   Page 26 of 37   Document 92

a material breach does not automatically and ipso facto end a contract. It merely gives the injured party the right to end the agreement; the injured party can choose between canceling the contract and continuing it. If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term…. *If he elects instead to continue the contract, the obligations of both parties remain in force* and the injured party may retain only a claim for damages for partial breach.

*Precision Pine & Timber, Inc. v. United States*, 72 Fed. Cl. 460, 484 (2006) (internal citations omitted); *see also Emerald Investments Ltd. P'ship v. Allmerica Fin. Life Ins. & Annuity Co.*, 516 F.3d 612, 618 (7th Cir. 2008) ("If a party to a contract breaks it, the other party can abandon the contract (unless the breach is very minor…) and sue for damages, or it can continue with the contract and sue for damages….But if it makes the latter election, it is bound to the obligations that the contract imposes on it.").

Here, Washington Square continued to receive Section 8 subsidies from WHEDA until its HAP contract expired on November 30, 2012. (Docket #72 ¶ 15). In other words, Washington Square continued to received the benefit of its bargain with WHEDA despite WHEDA's failure to adjust Washington Square's Contract Rents on an annual basis. Thus, Washington Square was "bound to the obligations that the [HAP] contract impose[d] on" it, which, as discussed above, required Washington Square to request rental adjustments when it desired a change in its Contract Rents. As Washington Square did not abandon the HAP contract when WHEDA (allegedly) breached it, Washington Square cannot now claim that it was excused from

complying with the condition precedent in Section 2.7(b).[24] *Emerald Investments Ltd. P'ship*, 516 F.3d at 618.

To conclude, none of the arguments set forth by Washington Square establish that it was excused from performing its HAP contract's condition precedent. Thus, because the only occasions in which Washington Square failed to receive a rent adjustment were those years in which it did not request one, *i.e.*, the years in which it failed to satisfy the condition precedent, the plaintiffs' breach of contract claim must fail.[25]

### 4.1.2 WHEDA Properly Complied With "Applicable" AAF's When Calculating Rent Adjustments

The plaintiffs' second claim relates to the manner in which WHEDA calculated the plaintiffs' rent adjustments. (*See* Docket #71 at 8-11). Specifically, the plaintiffs challenge WHEDA's use of reduced AAFs for non-turnover units, *i.e.*, those AAFs embodied in HUD's Table 2. (Docket #77 at 11-13). In response, WHEDA argues that under each of the plaintiffs' HAP contracts, WHEDA was only required to use the "applicable" AAFs when adjusting Contract Rents, which were, at all times relevant, determined and published by HUD. (Docket #80 at 7). Thus, according to WHEDA, since it had no authority or discretion under the parties' agreements to determine the

---

[24]And to reiterate, the plaintiffs did allege a breach of contract claim against WHEDA arising out of WHEDA's alleged use of rent comparability studies, but the plaintiffs chose to dismiss this claim for lack of an evidentiary record on which to base it. (Docket #24 at 6 n. 3).

[25]WHEDA and HUD also claim that the majority of Washington Square's rent adjustments would have also been barred under the overall limitation clause of the HAP Contract. (Docket #67 at 8-11; #71 at 11-14). However, as the Court has concluded that: (1) the only circumstances under which Washington Square did not receive a rent adjustment were the years in which it did not request one; and (2) Washington Square was not excused from asking for rent adjustments in order to receive them, the Court need not address this secondary argument.

"applicable" AAFs, it cannot be held liable for relying on AAFs that HUD prescribed. (Docket #80 at 7). The Court agrees with WHEDA and finds that WHEDA did not breach any of the plaintiffs' HAP contracts by applying HUD's Table 2 AAFs for non-turnover units.

In evaluating the plaintiffs' claim, the Court must again begin with the language of the HAP contracts themselves. *See 1325 N. Van Buren, LLC*, 2006 WI 94, ¶ 53. On the one hand, Evergreen's and Grant Park's HAP contracts state that annual rent adjustments must be calculated "by applying the applicable Automatic Annual Adjustment Factor most recently published by the Government." (Docket #76, Ex. 1 at 16-17; Ex. 2 at 8). In addition, the HAP contracts make clear that it is HUD's responsibility to determine the "applicable" AAFs. (*See* Docket #76, Ex. 1 at 16-17; Ex. 2 at 8) (stating that AAFs "will be determined by the Government…[and] will be published in the Federal Register"); (*see also* Docket #76, Ex. 1 at 3; Ex. 2 at 4) (defining "[g]overnment" as "the United States of America acting through the Department of Housing and Urban Development").

On the other hand, Washington Square's HAP contract states that, "[u]pon request from the Owner, contract rents shall be adjusted on the anniversary date of the Contract in accordance with 24 C.F.R. Part 888 and this Contract." (Docket #76, Ex. 3 at 17); *see also* 24 C.F.R. § 888.203(b) (explaining that adjustments in Contract Rents "shall be determined by multiplying the Contract Rent in Effect on the anniversary date of the contract by the applicable Automatic Annual Adjustment factor"). Under 24 C.F.R. Part 888, HUD is charged with the duty to create and then publish AAFs. *See* 24 C.F.R. § 888.202 ("Adjustment Factors will be published in the Federal Register at least annually by Notice. Interim revisions may be published as market conditions indicate. In the case of revised factors

applicable only to specific areas, the HUD Field Office will publish a notice appropriate to the limited scope of the revised factors."); s*ee also* 24 C.F.R. § 888.203 ("To compute an adjustment to a Contract Rent, find the schedule of Automatic Annual Adjustment Factors for the appropriate Census Region or Standard Metropolitan Statistical Area, as indicated in Schedule C."); Publication of Schedule C—Contract Rent Automatic Annual Adjustment Factors, 42 F.R. 60508-01, § 888.201 ("Schedule C of this Part sets forth the Automatic Annual Adjustment Factors as determined by HUD for the following Section 8 Housing Assistance Payments Programs….").

The Court concludes that the plain language of the parties' HAP contracts—and corresponding federal regulations—define the "applicable" AAFs as those that were created and published by HUD. The plaintiffs have proffered no argument or evidence to rebut this. As is made clear under the HAP contracts, WHEDA did not have any role or discretion to determine the AAFs that it in turn used in calculating rent adjustments. Moreover, for each of the relevant years in dispute, HUD has published two tables of AAFs in the Federal Register. (Docket #72 ¶¶ 29-30). Table 1's AAFs applied to rent adjustments for turnover units, while Table 2's AAFs applied to rent adjustments for non-turnover units. (Docket #72 ¶¶ 29-30). Thus, WHEDA's reliance on HUD's Table 2 AAFs when calculating rent adjustments for the plaintiffs' non-turnovers units was not only permissible under their HAP contracts, but was indeed obligatory.

Every court to decide whether a *state* housing agency that applied the reduced AAFs published by HUD for non-turnover units breached the language contained in the plaintiffs' HAP contracts has rejected the rental property owners' claims. *See e.g.*, *Cathedral Square Pts. Ltd. P'ship*, 2011 WL 43019, at *14-*18; *Greenleaf Ltd. P'ship*, 2010 WL 3894126, at *4-*8; *Arlington*

*Hous. Pts., Inc.*, 2012 WL 1078835, at \*6-\*8 ("The HAP contract clearly contemplates that the amount of annual adjustments will be determined by HUD and applied by the parties, and that both parties accept that this term will vary at the discretion of HUD."). Courts that have ruled otherwise have specifically done so in the context of law suits against HUD. *See e.g.*, *Haddon*, 711 F. 3d at 1336; *Statesman*, 66 Fed. Cl. at 625.[26] As WHEDA, and not HUD, is the relevant contracting party in this case, the plaintiffs' reliance on *Haddon* and *Statesman* is misplaced. *See Greenleaf Ltd. P'ship*, 2010 WL 3894216, at \*7 ("Even if the Court were to adopt the analysis in *Statesman II* that HUD has not published adequate findings to support the .01 reduction for [n]on-[t]urnover [u]nits, that conclusion does not establish that [the state housing agency] breached the [HAP] [c]ontract.").

Moreover, the language of the plaintiffs' HAP contracts does not set forth the manner in which AAFs are to be calculated. In other words, nothing in the language of these HAP contracts supports the plaintiffs' theory "that there will be a single, monolithic factor for all units at a given property or that Congress could not authorize HUD, in determining the [automatic annual adjustment factor] for a given unit, to make a different adjustment for those in which no turnover had occurred." *Cathedral Sq. Pts. Lim. Ptshp.*, 2011 WL 43019, at \*16 (citing *Cuyahoga Metro. Hous. Auth.*, 65 Fed. Cl. at 542). In

---

[26]The Court acknowledges that *Haddon* calls into question the persuasive value of the reasoning underlying other Court of Claims decisions, including *Park Properties* and *Cuyahoga*. *See Haddon*, 711 F. 3d at 1336. Importantly, however, these Court of Claims cases were also primarily concerned with addressing whether *HUD's* promulgation of Table 2 AAFs was "reasonable" under Section 8. *See Park Props. Assocs. LP*, 74 Fed. Cl. at 274; *Cuyahoga Metro. Hous. Auth.*, 65 Fed. Cl. at 542. The question analyzed in these cases is, therefore, distinct from the question presented here, which is whether *WHEDA* can be liable for breaching the plaintiffs' HAP contracts because it applied the AAFs mandated by HUD.

fact, since the inception of Section 8, HUD has published AAFs that differ based on various unit-specific characteristics, including geographic location, number of bedrooms, the price range of the rental unit, whether utilities are included in the unit, and whether the unit has "turned over" since the previous contract anniversary date. *See e.g.*, Section 8 Housing Assistance Payments Program—Fair Market Rents and Contract Rent Automatic Annual Adjustment Factors, 41 Fed. Reg. 49440 *et seq.* (Nov. 8, 1976). These various unit-specific AAFs have been in effect since each of the plaintiffs signed their HAP contracts. Section 8 Housing Assistance Payments Program—Fair Market Rents and Contract Rent Automatic Annual Adjustment Factors, Schedule C, 44 Fed. Reg. 65924 *et seq.* (Nov. 15, 1979); Section 8 Housing Assistance Payments Program—Fair Market Rents and Contract Rent Automatic annual Adjustment Factors, 48 Fed. Reg. *2595 et seq.* (Jan. 20, 1983). Thus, the plaintiffs have been on notice that the AAFs upon which their rent adjustments depended on were being continually developed and refined by HUD based on a myriad of market-based factors.

In sum, the plaintiffs' argument that WHEDA breached the plaintiffs' HAP contracts by using HUD's Table 2 AAFs for non-turnover units is essentially a challenge directed to HUD's alleged failure to comply with its statutory obligations. However, this claim fails to identify any breach of contract by WHEDA. WHEDA, for its part, has properly complied with its duty to rely on the "applicable" AAFs created and published by HUD in adjusting the plaintiffs' Contract Rents. As such, the plaintiffs' claim must fail and WHEDA must prevail as a matter of law.

### 4.3 The Plaintiffs Are Not Entitled To Declaratory Relief

Finally, the plaintiffs request a declaration that: (1) WHEDA may not require Evergreen to submit a rent comparability study as a prerequisite to receiving future rent increases to which Evergreen is entitled under its HAP contract; and (2) the AAFs used to calculate the future rent increases to which Evergreen is entitled may not be reduced by .01 for non-turnover units. (Docket #4 at 12-13). In their summary judgment briefs, the plaintiffs present ample argument with respect to the propriety of WHEDA's use of Table 2 AAFs for non-turnover units' rent adjustments; however, the plaintiffs do not provide the Court with any argument with respect to the propriety of rent comparability studies under Evergreen's HAP contract. WHEDA claims that, based on the published 2016 Fair Market Rents, the plaintiffs' claim is likely moot[27] (Docket #71 at 20 n.24) and/or meritless (Docket #71 at 20-21).

Litigants have no "right" to declaratory relief. Pursuant to 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction…any court of the United States…*may* declare the rights and other legal relations of any interested party seeking such declaration." (emphasis added). In order for the Court to issue a declaratory judgment, "there must be a dispute which 'calls, not for an advisory opinion upon a hypothetical basis, but for an adjudication of present right upon established facts.'" *Wiesmueller v. Nettesheim*, No. 14-C-1384, 2015 WL 3872297, at *2 (E.D. Wis. June 23, 2015) (citing *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977)). "[T]he propriety of declaratory relief in a particular case will depend upon a circumspect sense

---

[27]WHEDA does not develop this argument more fully. It is unclear to the Court how the Fair Market Rents for 2016 would moot this declaratory claim, unless WHEDA is already aware of Evergreen's current Contract Rents. However, as this information was not provided or explained more fully, the Court cannot base its ruling on this argument.

of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." *Arnold v. KJD Real Estate, LLC*, 752 F.3d 700, 707 (7th Cir. 2014) (internal citations omitted).

"[E]ven where a case presents an actual controversy, a court may refuse to grant declaratory relief for prudential reasons." *Alcan Aluminium Ltd. v. Dep't of Rev. of Or.*, 724 F.2d 1294, 1298 (7th Cir. 1984). For example, "the Court has warned against the grant of a declaratory judgment involving an important question of public law on the basis of a sparse and inadequate record." Particular Cases—Public Law, 10B Fed. Prac. & Proc. Civ. § 2763 (3d ed.). Moreover, "when [a] traditional remedy provides the parties with the procedural safeguards required by the law to insure the availability of a proper remedy, the courts, in exercising their discretion, may properly dismiss the declaratory judgment action." *Cunningham Bros. v. Bail*, 407 F.2d 1165, 1169 (7th Cir. 1969). Courts must ultimately consider "whether there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Alcan Aluminium Ltd.*, 754 F.2d at 1298 (internal citations omitted)*; see also Atlas Air, Inc. v. Air Line Pilots Assoc.*, 232 F.3d 218, 227 (D.C. Cir. 2000) ("Under the Declaratory Judgment Act, a dispute 'must not be nebulous or contingent but must have taken on fixed and final shape.'") (citations omitted).

The Court will exercise its discretion under 28 U.S.C. § 2201 to deny the plaintiffs' request for declaratory relief. First, the Court has already found that WHEDA did not breach Evergreen's HAP contract when applying Table 2 AAFs to non-turnover units. (*See supra*, Part 4.1.2). Thus, there is no longer a substantial controversy between the plaintiffs and WHEDA with respect to this aspect of the plaintiffs' claim.

Second, Evergreen and WHEDA's alleged controversy over rent comparability studies is neither sufficiently immediate nor concrete to justify this Court's exercise of discretion in ruling on a declaratory judgment claim. As discussed above, the parties have presented no facts with regard to whether, when, and exactly how WHEDA has enforced its rent comparability study policy. This observation makes sense, as the plaintiffs admit that they have never submitted studies to WHEDA. (Docket #24 n. 3). While WHEDA maintains that it follows HUD Notice H 2002-10 in calculating rent adjustments (Docket #72 ¶¶ 25-26), Notice H 2002-10 appears to require a rent comparability study if the owner seeks an adjustment on units whose Gross Rents exceed Fair Market Rents for that year. (Docket #79, Ex. 1 at 3). The undisputed facts, however, demonstrate that WHEDA did not require Washington Square to submit rent comparability studies in at least two instances in 2011 when they should have theoretically been required under Notice H 2002-10. (*See supra*, Table A). At bottom, therefore, WHEDA's enforcement of the rent comparability procedure is unclear, and, as such, the existence of a genuine controversy between the parties is not sufficiently definite to justify this Court's discretionary power.

The declaratory judgment standard acknowledges that "[a] judgeship does not come equipped with a crystal ball." *United States v. Kappes*, 782 F.3d 828, 838 (7th Cir. 2015). The Court declines the opportunity to review the plaintiffs' declaratory judgment claim because the undisputed facts do not reveal that there is an actual and immediate controversy between Evergreen and WHEDA upon which to rule.

### 4.4 WHEDA's and HUD's Third-Party Motions Are Moot

WHEDA and HUD have both moved for summary judgment with respect to WHEDA's breach of contract claim and declaratory judgment claim against HUD. (*See* Docket #74, #66). WHEDA's third-party claims, however, seek only amounts for which WHEDA may be held liable to the plaintiffs. (*See generally* Docket #75). Because the Court has determined that WHEDA is entitled to judgment as a matter of law with respect to all of the plaintiffs' claims, it is unnecessary for the Court to address WHEDA's and HUD's respective motions. Therefore, WHEDA's and HUD's motions will be denied as moot.

### 5. CONCLUSION

The Court concludes that the undisputed facts show that WHEDA is entitled to judgment as a matter of law with respect to all of the claims that the plaintiffs made against it, and, as such, its motion will be granted. (Docket #70). In addition: (1) the plaintiffs' motion for summary judgment against WHEDA (Docket #77) will be denied; (2) WHEDA's motion for summary judgment against HUD (Docket #74) will be denied as moot; and, (3) HUD's summary judgment motion against WHEDA (Docket #66) will be denied as moot.

Accordingly,

IT IS ORDERED that WHEDA's motion for summary judgment against the plaintiffs (Docket #70) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiffs' motion for summary judgment against WHEDA (Docket #77) be and the same is hereby DENIED;

IT IS FURTHER ORDERED that WHEDA's third-party motion for summary judgment against HUD (Docket #74) be and the same is hereby DENIED as moot;

IT IS FURTHER ORDERED that HUD's motion for summary judgment against WHEDA (Docket #66) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that this action be and the same is hereby DISMISSED in its entirety.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 4th day of January, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge